# EXHIBIT C

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


  D.A., et al.,                    .
                                   .
          Plaintiffs,              .  CA No. 25-3135 (TSC)
                                   .
      v.                           .
                                   .
  KRISTI NOEM, et al.,             .  Washington, D.C.
                                   .  Friday, September 12, 2025
          Defendants.             .  2:12 p.m.
  . . . . . . . . . . . . . . . .
```

```
                    TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE TANYA S. CHUTKAN
                    UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

| | |
|---|---|
| For Plaintiffs: | NOAH BARON, ESQ.<br>Asian Americans Advancing Justice<br>AAJC<br>1620 L Street NW<br>Suite 1050<br>Washington, DC 20036 |
| | PATRICK TAUREL, ESQ.<br>Grossman Young & Hammond<br>4922 Fairmont Avenue<br>Suite 200<br>Bethesda, MD 20814 |
| For Defendants: | ELIANIS PEREZ, ESQ.<br>MATTHEW SEAMON, ESQ.<br>U.S. Department of Justice |
| Court Reporter: | BRYAN A. WAYNE, RPR, CRR<br>U.S. Courthouse, Room 4704-A<br>333 Constitution Avenue NW<br>Washington, DC 20001 |

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1              P R O C E E D I N G S

2         DEPUTY CLERK:  Your Honor, we are on the record in

3    civil case 25-3135, D.A., et al., versus Noem, et al.

4       Counsel, please state your appearances for the record,

5    starting with the plaintiff.

6         MR. BARON:  This is Noah Baron for plaintiffs with

7    Asian Americans Advancing Justice AAJC.

8         MR. TAUREL:  Good afternoon.  This is Patrick Taurel

9    representing the plaintiffs, and I'm with Grossman, Young &

10   Hammond.

11        THE COURT:  All right.  Thank you.

12      Counsel for defendants?

13        MS. PEREZ:  Good afternoon, Your Honor.  My name

14   is Elianis Perez on behalf of the defendants in this case.

15        THE COURT:  All right.  Elianis P-E-R-E-Z?

16        MS. PEREZ:  Yes.

17        THE COURT:  All right.

18        MR. SEAMON:  Good afternoon, Your Honor.  Matthew

19   Seamon, also for the defendants.

20        THE COURT:  All right.  Good afternoon.  Thank you all

21   for being here on such short notice.  I am in receipt for a

22   motion for a temporary restraining order brought on behalf of

23   several plaintiffs.

24      Plaintiffs have filed a complaint against defendants

25   Kristi Noem, Todd Lyons, Pamela Bondi, and Marco Rubio,

claiming violations to the APA, the Fifth Amendment Due

Process Clause, the withholding of removal statute and

Convention Against Torture statute, as well as a Freedom

of Information Act request.  The plaintiffs are noncitizens

who have been granted fear- based immigration relief, either

withholding or removal or CAT — Convention Against Torture —

protection.

On September 5, they were awakened from their beds in an

ICE facility, put on a U.S. military cargo plane, and sent

to Ghana.  They are not Ghanaian citizens.  They appear to

be citizens of Nigeria and The Gambia.  They do not have

connections to Ghana, and none of them designated Ghana as

a potential country for removal during the course of their

immigration proceedings.  Plaintiffs were taken to Dema Camp,

a remote, open-air detention camp surrounded by armed military

guards.

Today they filed an *ex parte* motion for a temporary

restraining order.  They claim that they now face removal to

their countries of origin from Ghana, that Ghana's going to

send them either to The Gambia or Nigeria, and I believe one

of the plaintiffs has already been sent there at a time

unknown today.

So a couple of questions.  Plaintiffs ask that I enjoin

the defendants from removing, facilitating, enabling, or

encouraging removal of plaintiffs to their countries of origin

1    and order the defendants to facilitate the plaintiffs' return

2    to the custody of the United States.

3        In the alternative, they ask that I order the defendants

4    to notify the Ghanian government not to remove plaintiffs to

5    their countries of origin or other countries where they fear

6    persecution or torture nor subject them to unreasonable

7    conditions until a motion for preliminary injunction can be

8    filed and briefed.

9        So given the emergency nature of the relief sought,

10   I scheduled this hearing.  First of all, why did you file it

11   *ex parte*?  If it's *ex parte*, it comes to me, it doesn't go on

12   public docket.  If it's on the public docket, it's by nature

13   not *ex parte*.  Was that just in the flurry of the moment?

14            MR. BARON:  Yes, Your Honor.

15            THE COURT:  Okay.  So there's no reason to keep it

16   sealed, and obviously -- has the government had a chance to

17   read the motion and the request for relief?

18            MS. PEREZ:  Generally, yes, Your Honor.

19            THE COURT:  All right.  So let me just clarify.  One

20   plaintiff was already sent to -- I don't know why we still

21   call it "The" Gambia, but The Gambia.  And the others are

22   still at the detention facility in Ghana?  Is that correct?

23            MR. BARON:  That's the information we have current as

24   of 8:30 this morning.

25            THE COURT:  All right.  Let's assume that they are

1    still there.  Plaintiff D.A. is a citizen and native of

2    Nigeria, T.L. is a citizen and native of Nigeria, I.O. is a

3    citizen and native of Nigeria, K.S. is a citizen and native

4    of The Gambia, and D.S. is also a native and citizen of The

5    Gambia.  K.S. is the plaintiff who has already been removed.

6        So here's my first question.  And there's a whole bunch

7    of other questions, but my first question is how do I have

8    jurisdiction?  I read the motion.  It appears that certainly

9    there may be grounds for a challenge based on the individuals

10   being taken suddenly and without warning and without any

11   apparent due process and being placed on a plane and taken to

12   another country, which is happening alarmingly frequently in

13   this country.

14       But putting that aside, they are now in Ghana.  They're

15   being held by Ghanian authorities.  They are being held in a

16   Ghanaian detention facility.  The plaintiff who was

17   repatriated to The Gambia was repatriated on a Air Africa

18   airline.  So it does not appear that, having taken these

19   individuals to Ghana, the U.S. has any further control over

20   them, in which case, how do I have jurisdiction?

21           MR. TAUREL:  For the same reason the Supreme Court

22   determined that the United States needed to return Mr. *Abrego*

23   *Garcia*, who was also in the custody of a foreign sovereign.

24           THE COURT:  That was a long, long road.

25           MR. TAUREL:  Indeed, although the court did direct the

1    United States to facilitate Mr. Abrego Garcia's return, which

2    is the same relief that we're requesting with Your Honor.

3         THE COURT:  Well, before I -- all right.  And for all

4    of the plaintiffs; is that what you're saying?

5         MR. TAUREL:  Yes, Your Honor.

6         THE COURT:  Before I can order that, though, there are

7    certain -- in other words, what's the emergency?  That may be

8    so, and it may be that after a hearing on the merits I decide

9    that they need to be returned because they were wrongfully

10   deported; but beyond that, you're asking me for a TRO to order

11   them returned because Ghana might repatriate them, and I'm not

12   sure how I can do that.

13        MR. TAUREL:  So as far as we know, the plaintiffs were

14   removed --

15        THE COURT:  In other words, I can't order the Ghanaian

16   government to do anything.

17        MR. TAUREL:  Understood, Your Honor.  What is secret at

18   this point in time is the terms of the agreement between the

19   United States and Ghana.  We do not know to what extent the

20   United States is still exerting control over the individuals

21   in question.

22        THE COURT:  And it appears that that agreement between

23   Ghana and the United States is like, what, two days old or

24   something?  Or at least it was reported yesterday or the day

25   before yesterday?

1          MR. TAUREL:  That's right.  There's been some press

2     in the African press about this agreement.  That's right.

3          MR. BARON:  I would like to note, Your Honor, that

4     there are -- the information that we have that we've garnered

5     from our plaintiffs does suggest that the United States is

6     exercising at least some control over at least their ultimate

7     destination.

8      One plaintiff was told by an officer while en route to

9     Ghana that he would arrive in Ghana and then Ghana would send

10    him to his country of origin, and then I believe another

11    officer told a Ghanaian official in the presence of one of the

12    plaintiffs something to the same effect.

13         THE COURT:  I guess what I'm struggling with here is

14    what I can do at this stage.  Again, as I said before, I can't

15    order the Ghanaian government to do anything.  What you are

16    asking me in the motion is for me to order the U.S. government

17    to tell the Ghanaian government not to repatriate them.  But

18    there's no enforcement -- I'm not sure if I can order the U.S.

19    government to order another country to do anything.

20     Do you have any citation for any authority that I have to

21    do such a thing?  I'm not talking about whether it's right or

22    wrong.  I'm just not sure if I have the legal authority to do

23    that.

24         MR. TAUREL:  No, I appreciate that, Your Honor.

25    I think this is the same conundrum that Judge Xinis was facing

1    in *Abrego Garcia*, and I think that the way that they thread

2    that needle was to order the government to facilitate the

3    return, and we think that in the precedent of *Abrego Garcia*,

4    at a minimum the court has the authority to do that.

5    THE COURT:  But that was not Judge Xinis's -- that

6    wasn't the result of the TRO.  That came much later, after

7    there had been attempts, as I recall, just from -- obviously,

8    I'm not assigned to that case, but initially the Salvadorian

9    government refused; they said we're not giving him back or

10    whatever the tweet was.

11    Beyond what ultimately happened in that case, what's your

12    authority for me being able to do what you're asking me to do

13    today?  In other words, what you're asking me to do today is

14    tell the government to tell Ghana not to repatriate those

15    plaintiffs and to keep them in the detention facility where

16    they are controlled by Ghanaian authorities?  I'm just sort of

17    mystified as to what my authority is here.

18    MR. BARON:  Yes, Your Honor.  So I think there are a

19    couple of things here.  One is that, to the extent that the

20    United States is exercising control over the actions of the

21    Ghanaian government, similar to the situation in El Salvador

22    in the *Abrego Garcia* case, you would have the authority to

23    have the United States government, with the Ghanaian

24    government acting as their agent, direct the United States

25    government to issue that remedy.

1          THE COURT:  But what findings would I have to make

2     before I could issue such an order, and what authority -- I

3     mean, is there a case or a statute that says I can do this

4     other than -- you know, the whole situation appears to be --

5     this putting people on planes in the middle of the night and

6     just flying out of this country is a whole other situation.

7     But regardless of my thoughts on that kind of procedure, what

8     is it that I can do here, and under what authority?

9          MR. TAUREL:  We recognize the conundrum.  This is the

10    problem with these expeditious, middle-of-the-night removals,

11    is that the United States hands over individuals to foreign

12    governments and then washes their hands of the problem and

13    leaves district courts in this tough spot.

14         THE COURT:  So, I mean, I think we would be in a

15    different situation if, as happened to my colleague last

16    weekend, they were sitting on the plane on the ground in

17    United States.  But this was -- they already left.  And now

18    they're in the custody and control of a foreign government.

19         MR. TAUREL:  Noted.  All the relief that we're seeking

20    goes towards the directions to the United States government as

21    opposed to Ghanaian government.  We think there's ample

22    authority for the court to direct the United States, at a

23    minimum, to facilitate the return.

24         THE COURT:  That's what I'm asking you.  Where's the

25    ample authority?  Under what statute or what -- Declaratory

1    Judgment Act?  Can I order the Department of Homeland Security

2    to bring them back or at least to tell Ghana not to move them?

3         MR. BARON:  So the court, of course, has equitable

4    authority, and there's --

5         THE COURT:  Yeah, well, the Supreme Court's had a

6    little something to say about that.

7         MR. BARON:  Perhaps, Your Honor, but it's the same

8    authority that the court exercised in the *Abrego Garcia* case

9    and that the Supreme Court did not reject when that case came

10   to the Supreme Court.  And I think as a matter of equity,

11   restoring the plaintiffs to the status quo ante I think is

12   quite reasonable here.

13        THE COURT:  Well, the thing with the *Abrego Garcia* case

14   is that Mr. Abrego Garcia, his removal to El Salvador was the

15   result of an administrative error.  That was a concession.

16   It's not clear that that's case here, right?

17        MR. BARON:  Right.  Here the federal government

18   purposefully violated the law.

19        THE COURT:  Well, they're going to have something

20   to say about that.  The partnership between the U.S. and

21   El Salvador in that case was also public.  I don't know --

22   and I'm going to have some questions to the government on

23   the nature of that partnership itself.  But I think just

24   saying I have equitable power is not going to get me there

25   when it comes to, you know, there's separation of powers,

1    there's all sorts of reasons why I can't order the government

2    to tell other governments what to do.  So I'm sort of looking

3    for a more specific grant of authority here.

4        But let me hear -- who's going to be speaking for the

5    government?

6             MS. PEREZ:  I am, Your Honor.

7             THE COURT:  All right.  Couple things.  One is, under

8    what -- what are the terms of the partnership between the

9    United States and Ghana here?

10            MS. PEREZ:  Your Honor, what the State Department

11   has informed us is that the State Department has received

12   diplomatic assurances that conform with the March 30th third-

13   country removal guidance that the Supreme Court has allowed

14   in *D.V.D.*

15            THE COURT:  So, wait.  So you don't know what the terms

16   of the partnership are; you've just received reassurance from

17   the State Department that it's legal.

18            MS. PEREZ:  They received a diplomatic note indicating

19   assurances from the Ghanaian government that these individuals

20   were going to be taken there and then they were not going to

21   be tortured or taken to a place where they would be tortured.

22            THE COURT:  Well, one plaintiff alleges that he has

23   been taken to a place where he was going to be tortured.  The

24   plaintiff who was returned, repatriated to Gambia, who has

25   alleged a fear of persecution, torture, and even death because

1    of his sexuality is now in Gambia where he alleges and states

2    in his declaration that he is in hiding and is in fear of his

3    life.  So that does not appear to be the case.

4       But what you're telling me is -- I'm asking what are the

5    terms of this agreement, and you're telling me, well, what we

6    know is that the State Department says it's all good and

7    up-and-up, and Ghana has told us that they're going to treat

8    these people right.  That's not what I'm asking.  I'm asking

9    for the terms of the agreement that the United States entered

10    into with Ghana to take these individuals.

11       MS. PEREZ:  Right.  Your Honor, those are diplomatic

12    assurances and discussions between two sovereign nations,

13    which the Supreme Court has said that those --

14       THE COURT:  Those may be assurances and diplomatic

15    discussions, but they involve removing -- and I'm going to get

16    to this -- removing individuals in the United States who had

17    been granted protection, even if it's temporary, by an

18    immigration authority.  They weren't just here on the streets

19    illegally.  They had gone through the process.  They had

20    followed the rules, and they were awaiting either a final

21    decision or had already been granted protection.

22       So this isn't sort of people being returned who are just

23    here illegally with no status.  They had status.  And so the

24    fact that Ghana says, yeah, we'll take them and we'll treat

25    them fairly and decently and won't send them anywhere where

1    they'll be killed is not the point.  The point is under --

2    what's the terms -- what does Ghana agree to do?  Take anybody?

3    What are the terms of the agreement?  I'm not saying I have

4    the ability to challenge that or revoke that.  I want to know

5    what that agreement is, though, because I'm being asked to

6    assess the legality of the United States' actions in sending

7    these individuals to Ghana.

8         MS. PEREZ:  I understand, Your Honor.  I will say that,

9    again, those were discussions between the United States that

10   lasted multiple weeks, and to the extent --

11        THE COURT:  So you don't know the results of the

12   discussions.  You don't know what the terms of the agreement

13   are.

14        MS. PEREZ:  I do know, Your Honor, that the United

15   States received a diplomatic note from Ghana indicating that

16   they were going to abide by the international treaties --

17        THE COURT:  In doing what?  They're going to abide by

18   the international treaties in doing what?

19        MS. PEREZ:  That they were going to accept these

20   individuals into their country, they were not going to torture

21   them, and they were going to make sure that if they were to be

22   taken to another country that they would not take them to a

23   country where they would be tortured.

24        THE COURT:  Do you know how many people Ghana has

25   agreed to accept?  Do you know when this will go on, when it

1    started, how long it will go on for, what due process these

2    individuals -- anything else other than Ghana said we're gonna

3    treat 'em properly?

4        MS. PEREZ:  Your Honor, I will say -- no.  I do not

5    know the answers to those questions, but what I will say,

6    Your Honor, that --

7        THE COURT:  Is this written down anywhere, this

8    agreement?

9        MS. PEREZ:  Your Honor, I do not know.  But I do know,

10   from the information that I have received from the State

11   Department, that there were discussions with Ghana for several

12   weeks, and these discussions are not to be taken lightly.

13   These discussions had to do with making sure that Ghana comply

14   with international treaties that particularly protect

15   individuals from being tortured.

16       THE COURT:  Well, that may be so, and I'm sure Ghana

17   made all the right representations.  I don't know because I

18   don't have the agreement before me.  But what I do have before

19   me is a motion in which there are declarations from plaintiffs

20   that state that they have not in fact been held in civilized

21   conditions, that they have been held in insanitary conditions

22   that violate the convention, and that in fact at least one of

23   them who was repatriated to The Gambia was even given

24   documents, and when he got to Gambia and Gambia refused to

25   accept him, the Ghanaian officials falsified documents or

attempted to falsify and somebody recognized him and said,

okay, we'll take him.  That's not exactly conforming to

international standards, is it?  At least according to the

allegations.

MS. PEREZ:  Your Honor, those are, as you said,

allegations.  The State Department informs me that they have

received no such information, so they cannot --

THE COURT:  Well, they've received it now because

there's a court complaint.

MS. PEREZ:  And, Your Honor, to the extent that

plaintiffs' counsel are trying to challenge the third-country

removal process, that issue is before *D.V.D.*, and that's being

litigated in the District of Massachusetts and it's also

before the First Circuit.

So to the extent that they're saying that these individuals

were unlawfully -- let's say unlawfully taken from the United

States because these third-country removal procedures are not

sufficient, those very issues are part of a nationwide class

that's being litigated in *D.V.D.* as well as the First Circuit.

In fact, in *D.V.D.* the district court issued a preliminary

injunction adding extra protections for these individuals, and

the Supreme Court stayed that injunction and said that the

March third-country removal guidance that DHS was following

was enough and it would allow the litigation of the case to go

before the First Circuit to see what the First Circuit says on

1    the issue.

2    THE COURT:  Why isn't this part of the nationwide class?

3    MR. TAUREL:  Thank you, Your Honor.  And I would also

4    like to return to your question earlier about authority, but

5    to address the nationwide class question, it's because we are

6    not challenging the memo.  We believe that the memo itself was

7    violated, the memo that counsel is referring to and which I

8    don't think the Supreme Court actually blessed.  In fact, we

9    don't know why they did what they did in --

10    THE COURT:  We don't know a lot of things.  We don't

11    know a lot of things.

12    MR. TAUREL:  And the most plausible theory is that

13    it has to do with 1252(f), which is the jurisdiction

14    restricting provision.  But in any case, the March 30th memo

15    requires the United States government to have satisfactory

16    diplomatic assurances that people will not be subject to

17    persecution and torture, and that, as Your Honor is

18    indicating, is precisely what the government did not do here.

19    THE COURT:  Well, I agree.  I have allegations, but

20    I'm not sure that based on what I have before me I can issue

21    any kind of order.  I understand that this is an emergency,

22    but normally in a case like this I could say at least let's

23    preserve the status quo.  But I can't preserve the status quo

24    because the status quo is controlled at the moment by the

25    government of Ghana, not the United States.

1          MR. TAUREL:  I think that's a little bit of an open

2     question about whether or not the United States is actually

3     controlling things in Ghana at the moment, but what I would

4     say is that the authority that the court has actually stems

5     from the APA, which allows the court to set aside unlawful

6     agency action.  And we think the agreement, at least the

7     diplomatic assurances that the government is relying upon

8     to effectuate these removals, is unlawful.

9          THE COURT:  But then isn't that an issue for diplomatic

10    challenges?  In other words, if Ghana has entered into an

11    agreement with the United States and through diplomatic

12    processes, said, yes, we will do this and we will follow the

13    international conventions on the treatment of deportees or

14    whatever it is, and we will keep them in humane conditions,

15    and that agreement is being violated, isn't that a matter for

16    the diplomatic process?  Wouldn't I be infringing on that?

17      I mean, look.  Your clients are in dire straits, and it's

18    a very sympathetic and heart-wrenching situation.  But I have

19    to follow procedure.

20         MR. TAUREL:  What I would say, Your Honor, is these

21    are not the only men that are going to be removed pursuant to

22    agreement.  There are people in the United States right now

23    from West Africa, and Ghana appears, as far as we can tell, to

24    have been selected for this agreement because it has kind of

25    like a Schengen agreement with other West African nations

1   where they can just remove people to Ghana without visas, and

2   then those folks will be presumably sent, as we're seeing with

3   one of our plaintiffs and potentially others, directly to

4   their home countries.  And this is basically the United States

5   doing indirectly what it cannot do directly under the

6   Convention Against Torture.

7       THE COURT:  But my hands are tied.  They may well be.

8   In fact, I'm sure this is just a trickle of what's going to

9   be a flood.  But I can't rule anticipatorily.  I can't give

10  prospective relief like that.  So what I have here are these

11  plaintiffs, one of whom I don't think -- I mean, short of

12  ordering the United States to bring him back as Judge Xinis

13  ultimately did.  We're not there yet.

14      And then the others who are there, at least as far as we

15  knew this morning, who may have in fact been sent off to their

16  countries of origin already, if your allegation is they're not

17  being kept or housed humanely, that is a diplomatic issue.

18  And to the extent they were removed improperly, then that is

19  an issue that is before the court in Massachusetts in the

20  First Circuit.  That's my problem here.

21      MR. TAUREL:  So I think the difference between -- the

22  *D.V.D.* litigation is challenging the adequacy of procedures

23  that the government is applying prior to removing someone to a

24  third country.

25      THE COURT:  And you challenge those too in this case,

1    don't you?  You've pled that these were individuals who were

2    afforded protection here and were summarily removed without

3    due process, right?  So why wouldn't those claims belong in

4    *D.V.D.*?

5         MR. TAUREL:  We may, Your Honor, amend our complaint.

6    I think that the main thrust of our concern really is kind of

7    like an Accardi violation, that the government has adopted

8    this policy and under the policy they have to secure adequate

9    diplomatic assurances, and whatever they have secured is not

10   that.

11        MR. BARON:  I do want to briefly add, Your Honor, with

12   regard to your concerns over ordering the government of Ghana

13   to do things, again, in the *Abrego Garcia* case, in the

14   memorandum order the judge did note that there are a variety

15   of instances where individuals have been returned to the

16   United States.

17        THE COURT:  In those cases, I believe that return was

18   at the end -- there hasn't been a single case where a judge on

19   a TRO, in a short turnaround, has said bring them back, and in

20   this case, I can't even say don't move them, I don't think.

21        MR. TAUREL:  I'm sure there were a number of judges

22   in TRO settings where they actually ordered planes returned.

23   In fact, Judge Boasberg attempted to do that --

24        THE COURT:  Well, Judge Sooknanan did.  There was a

25   plane that had to turn around, but that was not the situation

1    here.  Those children were in a U.S. aircraft being returned

2    directly to their country of origin, and that's now a class

3    action.  But that's not the same here where we have a third

4    country where the U.S. has apparently relinquished control

5    over these individuals, even though you may have good reason

6    to suspect that they're still pulling the strings from afar.

7         MR. TAUREL:  I think the dearth of authority on this,

8    Your Honor, it's really a product of the fact that

9    historically the United States did not remove people to the

10   third countries, right?  And this is actually something that's

11   discussed in Guzmán Sanchez's Supreme Court case.  It's an

12   extraordinarily rare event --

13        THE COURT:  Well, I did have an enemy combatant case

14   sometime ago where an American citizen there, though, was

15   being held in Iraq as a suspected enemy combatant, and he

16   challenged his detention and the U.S. was going to turn him

17   over to Saudi Arabia.  They eventually decided that was --

18   they did decide against it.  But that was a U.S. citizen.

19        So, yes.  There is a dearth of authority because, yes,

20   this country has traditionally not acted this way.  But

21   here we are.

22        MR. TAUREL:  I don't want to concede that there is no

23   authority.  I think *Abrego Garcia* is a very recent Supreme

24   Court case where they ordered the government to facilitate the

25   return of a man who was in the custody of a foreign government.

1          THE COURT:  But again, *Abrego Garcia* involved a case

2     where the government conceded he had erroneously been

3     deported.  It was an administrative error.

4        As far as I know, Ms. Perez, is the government conceding

5     error that these individuals were mistakenly deported?

6          MS. PEREZ:  No, Your Honor.

7          THE COURT:  They may be wrong, but they're not

8     conceding it.

9          MR. TAUREL:  I would imagine, though, that the

10    government would acknowledge that the United States could not

11    have directly deported our client to The Gambia and that the

12    United States could not directly deport our clients to their

13    home countries, and yet they have entered into an arrangement

14    with Ghana that appears to be, if not designed to allow for

15    just that, then there was, at a minimum, some reckless

16    indifference to that reality.

17         THE COURT:  Let me ask you, counsel for the government,

18    do you agree that the U.S. could not have legally deported

19    without process, could not have put those individuals, these

20    plaintiffs, on a plane and flown them to their home countries?

21         MS. PEREZ:  I believe that pursuant to the facts as

22    the plaintiffs have put in the complaint and the TRO, those

23    individuals had removal relief from their country.

24         THE COURT:  Had what?

25         MS. PEREZ:  Removal relief from their country.

1          THE COURT:  In other words, they were here legally.

2     Is that right?

3          MS. PEREZ:  No, meaning that the United States cannot

4     remove them to their country.

5          THE COURT:  Okay.  But what the government has done

6     is ship them to a third country with the understanding that

7     they'll be sent to their country.  It's just that they can

8     then say, well, we didn't do it.

9          MS. PEREZ:  Well, Your Honor, we're not conceding that.

10          THE COURT:  Well, it looks that way.

11          MS. PEREZ:  The information we received from the State

12     Departments is they received credible and reliable assurances

13     during weeks-long conversation and discussions with Ghana that

14     this was not going to happen.

15          THE COURT:  But it's happened.

16          MS. PEREZ:  Your Honor, again, to the extent they're

17     challenging the sufficiency of the assurances, that is --

18          THE COURT:  No, no, no, no, no.  They're saying we know

19     that we could not have put these individuals on a plane and

20     flown them back to their home countries, but we entered into

21     an agreement with a third country that assured us that all

22     protocols will be followed.  So we sent them to this third

23     country, and, oops, they've sent one to his home country, and

24     it looks like they're getting ready to send the rest.

25     Is that right?

1           MS. PEREZ:  Your Honor, the United States does not have

2      control --

3           THE COURT:  What appears to be happening is truly

4      disingenuous.  You concede that this country could not have

5      put them on a plane and flown them to their home country.

6      So what you do is put them on a plane to a third country who

7      gets an agreement and a wink and a nod to repatriate them.

8      Because that's what happening.  It's not a theoretical, oh, we

9      don't have any control.  It's actually happening.

10          MS. PEREZ:  I understand the court's concern.

11     However, from the information we have received from the State

12     Department, the State Department took this matter and this

13     agreement very seriously, and the agreement that they received,

14     again, it was credible and reliable assurances.

15          THE COURT:  I've heard about the assurances.  Under

16     what authority were these plaintiffs taken out of this country?

17          MS. PEREZ:  They have final orders of removal,

18     Your Honor.

19          MR. TAUREL:  We concede that, Your Honor.

20          THE COURT:  And were they in the middle of proceedings?

21          MS. PEREZ:  No.  They were final.

22          MR. TAUREL:  If I may --

23          THE COURT:  Wait a second, I still have questions.

24     Does the government need to undergo -- does the government

25     need to follow any sort of administrative process before

1    removing them under withholding or in CAT?

2        MS. PEREZ:  The government has the ability to -- if an

3    individual has protections of removal to a particular country,

4    the government has the ability to remove them to a third

5    country.

6        THE COURT:  Right.  So that's a protection.  In other

7    words, because they had a fear of torture or physical harm in

8    their home country, you couldn't send them there, so you send

9    them to Ghana.

10        MS. PEREZ:  Exactly.

11        MR. TAUREL:  So the diplomatic assurances that counsel

12    is referring to, at least it appears that the president of

13    Ghana himself did not get the memo that they were not supposed

14    to remove people to third countries.

15        THE COURT:  I'm shocked.

16        MR. TAUREL:  Because if you read the quotes that appear

17    in our complaint, it appears that that was contemplated that

18    these individuals would be removed.  And that's part of the

19    problem of dealing with a secret agreement under which it

20    appears the CAT is going to be systemically violated.

21        And there's further evidence, Your Honor, and it's not in

22    the complaint, but it's in public domain, there were a number

23    of individuals that were deported to Eswatini, a landlocked

24    country in South Africa.  And there was a statement from the

25    foreign minister of Eswatini, and it went something to the

1    effect of these detainees -- again, those individuals were

2    also detained -- you know, we are working with the

3    international office of migration to repatriate these

4    detainees to their home countries.

5        Now, I don't know whether those individuals had the kinds

6    of protections from deportation to their home countries that

7    our clients have, but at a minimum it shows that there's a

8    pattern that third countries don't just keep their noncitizens

9    and assimilate them.  What they do is they remove them, and

10   they repatriate them to their home countries.  And it's

11   foreseeable that this will continue, and that's why we need

12   the court to set aside this unlawful agency action.

13       THE COURT:  Why don't I have the authority to order DHS

14   or the U.S. government to instruct Ghanaian authorities not to

15   repatriate these individuals?  Because that would seem to be

16   an awareness that you're not supposed to be breaking the law.

17   In other words, if this diplomatic process in which you engage

18   is truly aboveboard and sincere, then the United States would

19   not want these individuals repatriated into places where they

20   could face torture or death.

21       So why can't the government tell the Ghanaian authorities,

22   just keep them till we can figure out if they're supposed to

23   be with you?

24       MS. PEREZ:  Your Honor, again, there's case law in this

25   jurisdiction that indicates that we have a redressability

1    problem here.  I mean, these are actions of an independent

2    sovereign nation that's outside of our jurisdiction, and we

3    don't have any control over that.

4         THE COURT:  I'd like you to file a written response

5    to their motion.  How much time do you need?  I know, Friday.

6    Imagine my delight.

7         MR. TAUREL:  Sorry, Your Honor.

8         MR. BARON:  Your Honor, we would also be happy to

9    provide supplemental briefing --

10        THE COURT:  I do need supplemental briefing, but I

11   don't want sort of cross -- but given the time here, yes, you

12   can provide supplemental briefing.  How much time do you need?

13        MR. BARON:  Tomorrow, Your Honor, or close of business

14   on Saturday?

15        THE COURT:  Okay.  And when can you file an opposition

16   to plaintiffs' motion?  I'm not going to have you do it by

17   close of business tomorrow, but how soon can you do it?

18        MS. PEREZ:  I mean, to the extent -- if the court would

19   allow us at least until Wednesday.

20        THE COURT:  I will only allow till Wednesday if I can

21   get some representation that nothing's going to happen.  This

22   is a problem.  By Wednesday, all these individuals will have

23   been sent to Nigeria or Gambia, and trying to get them back,

24   the United States can say, well, we had no idea this would

25   happen.  And it would have happened.

1          MS. PEREZ:  Is it possible, Your Honor, that we could

2    have till close of business on Monday?

3          THE COURT:  Yes.

4          MS. PEREZ:  Thank you.

5          MR. BARON:  Your Honor, one final request.  Would it be

6    possible to seek discovery in relation to --

7          THE COURT:  The agreement?

8          MR. BARON:  Yes.

9          THE COURT:  Yes.

10          MS. PEREZ:  Your Honor, again, I mean the Supreme Court

11    has explicitly stated that those negotiations are unrevealed

12    by the court.

13          THE COURT:  I'm not going to get involved in diplomatic

14    negotiations, but I think if these individuals are being taken

15    out of the United States to a third country, their ultimate

16    destination being their country of origin where they were not

17    supposed to be, I'd like to see the terms of that agreement,

18    because what if the agreement says, yeah, we'll take them, but

19    we're going to send them home eventually, right?  Isn't that

20    something I'm entitled to see?

21          MS. PEREZ:  Your Honor, respectfully, no.  And also

22    we're operating under the assumption that there is some sort

23    of written agreement, not these diplomatic -- that the

24    decision to send them to Ghana were not just the result of

25    these political --

1          THE COURT:  All right.  Here's the thing.  If this

2     agreement has been reduced to writing, plaintiffs need to see

3     it.  I'll issue whatever protective order I need to issue.

4     If it's not, if it's just a wink and a nod, there we are.  But

5     if there's a written agreement, plaintiffs are allowed to --

6     or government is ordered to turn it over to the plaintiffs.

7          MR. BARON:  Thank you, Your Honor.

8          THE COURT:  Let me get the briefing.  We'll go from

9     there.  Thank you all.

10          MR. BARON:  Thank you.

11          MS. PEREZ:  Thank you, Your Honor.

12       (Proceedings adjourned at 2:51 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*    *    *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.




/s/ Bryan A. Wayne
Bryan A. Wayne